## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| MCOM IP, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | **6-21-CV-989-ADA** |
| v. | § | |
| | § | |
| WOODFOREST NATIONAL BANK | § | |
| AND INETCO SYSTEMS, LTD., | § | |
| *Defendants.* | § | |
| | § | |

### <u>MEMORANDUM IN SUPPORT OF CLAIM CONSTRUCTION ORDER</u>

On April 14, 2022, the Court held a hearing to determine the proper construction of the disputed claim terms in U.S. Patent No. 8,862,508 ("the '508 Patent").  Plaintiff mCom IP, LLC ("Plaintiff") accuses Defendants Woodforest National Bank and Inetco Systems, Ltd. (collectively "Defendants") of infringing claims 13-20 of the '508 Patent.  Dkt. No. 19 at 4.  Defendants filed an opening claim construction brief (Dkt. No. 19), to which Plaintiff filed a responsive brief (Dkt. No. 20), to which Defendants filed a reply brief (Dkt. No. 22).  The parties additionally provided a Joint Claim Construction Statement (Dkt. No. 23).[1]  Having considered the parties' arguments from the hearing and those presented in their claim construction briefs, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues a Claim Construction Order concurrent with this memorandum. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] Citations to the parties' claim construction briefs and Joint Claim Construction Statement are to the Case Management/Electronic Case Files (Dkt. Nos.) and pin cites are to the pagination assigned through ECF.

I.    OVERVIEW OF THE PATENT

The '508 Patent, titled "System And Method For Unifying E-Banking Touch Points And Providing Personalized Financial Services," issued October 14, 2014.  At a high level, the '508 Patent relates to the field of electronic banking solutions.  '508 Patent at 1:16-17.  More specifically, the '508 Patent relates to "a system and method for delivering a retail banking multi-channel solution that unifies interactive electronic banking touch points to provide personalized financial services to customers and a common point of control for financial institutions."  *Id*. at 1:18-23.

The '508 Patent explains that a majority of banking customers are now conducting business with electronic delivery systems provided by the financial institution, such as automatic teller or transaction machines (ATM), self-service coin counters (SSCC), kiosks, and other web-enabled devices.  '508 Patent at 1:27-35.  The '508 Patent refers to these electronic delivery systems as "electronic banking touch points," "e-banking touch points," or "touch points."  *See, e.g.*, '508 Patent at Abstract, 1:53, 2:8-13, 3:13-16, 3:42-56.  The '508 Patent asserts that conventional e-banking touch points, traditionally implemented as stand-alone systems, are deficient because they limit the ability of the financial institution to provide a more personalized e-banking experience to customers.  *Id*. at 1:53-59.  The '508 Patent contends that there is currently no system or method for unifying a financial institution's e-banking touch points into a common point of control.  '508 Patent at 1:63-67.

The '508 Patent discloses a client-server platform that is configured to unify a plurality of e-banking touch points for the purpose of enabling financial institutions to deliver and maximize on the impact of electronic offerings.  '508 Patent at 2:7-11.  The '508 Patent explains that the disclosed client-server environment integrates with existing channel systems provided by financial institutions, associating and connecting them to a common multi-channel server.  *Id*. at 2:21-24.

2

The client-server environment collects customer related data from e-banking touch point services. *Id*. at 2:27-36. The collected data is utilized to distribute advertisements and messages to touch point transaction screens viewable by a customer. *Id*. at 2:37-40. Customers are also able to customize their experience at e-banking touch points through the selection of personalized customer options. *Id*. at 2:42-44.

Independent claim 13 of the '508 Patent is reproduced below with its disputed terms in italics:

> 13. A unified electronic banking system, said system comprising:
>
> a common multi-channel server, wherein said multi-channel server is communicatively coupled to one or more independent computer systems;
>
> wherein each of one or more independent computer systems is associated with an independent financial institution, and each of said computer systems is communicatively coupled to said multi-channel server;
>
> one or more e-banking touch points, each of which comprise one or more of an automatic teller/transaction machine (ATM), a self-service coin counter (SSCC), a kiosk, a digital signage display, an online accessible banking website, a personal digital assistant (PDA), a personal computer (PC), a laptop, a wireless device, or a combination of two or more thereof, wherein one or more of said e-banking touch points are communicatively coupled to said multi-channel server, and wherein at least one of said e-banking touch points is in communication with one or more financial institutions through said multi-channel server; and
>
> a data storage device, wherein transactional usage data associated with a transaction initiated by a user through one of said e-banking touch points is stored in said data storage device and accessed by one or more of said other e-banking touch points;
>
> wherein *said active session* is monitored via said server in real-time for selection of *targeted marketing content* correlated to *said user-defined preferences*, said targeted marketing content correlated to said user-defined preferences is selected *subsequent to said monitoring and transmitted in real-time* to at least one of said e-banking touch points for acceptance, rejection, or no response by a user, and wherein

> said response by said user is used during said active session
> to determine whether transmission of additional information
> related to said marketing content occurs during said active
> session.

'508 Patent at 10:35–11:4 (emphasis added).

## II.   LEGAL PRINCIPLES

### A.   Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola,*

*Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).  First, a term's context in the asserted claim can be instructive.  *Phillips*, 415 F.3d at 1314.  Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent.  *Id.*  Differences among the claim terms can also assist in understanding a term's meaning.  *Id*.  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id*. at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Phillips*, 415 F.3d at 1314-15 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex, Inc.*, 299 F.3d at 1325.  But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'"  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed.

Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.  "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent.  *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'"  *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id*. at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court.  *Id.*  Extrinsic evidence is "less reliable

than the patent and its prosecution history in determining how to read claim terms." *Id.*  The

Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond
> the patent's intrinsic evidence and to consult extrinsic evidence in
> order to understand, for example, the background science or the
> meaning of a term in the relevant art during the relevant time period.
> *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent
> may be "so interspersed with technical terms and terms of art that
> the testimony of scientific witnesses is indispensable to a correct
> understanding of its meaning").  In cases where those subsidiary
> facts are in dispute, courts will need to make subsidiary factual
> findings about that extrinsic evidence.  These are the "evidentiary
> underpinnings" of claim construction that we discussed in
> *Markman*, and this subsidiary factfinding must be reviewed for clear
> error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015).

## B.    Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed

according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts

as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either

in the specification or during prosecution."[2]  *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d

1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362,

1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309

(Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the

plain meaning in two instances: lexicography and disavowal.").  The standards for finding

lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the
general rule, such as the statutory requirement that a means-plus-function term is construed to
cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v.
Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## III.   CONSTRUCTION OF DISPUTED TERMS

The parties dispute the meaning and scope of five claim terms in the '508 Patent.

### A.     "said active session"

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| plain and ordinary meaning<br><br>or<br><br>a session a customer is logged into an e-banking touch point | Indefinite |

#### 1.  Analysis

The term "said active session" appears in claim 13 of the '508 Patent. The principal dispute between the parties is whether claim term is indefinite, specifically whether the term informs a POSITA about the scope of the invention with reasonable certainty. Dkt. No. 19 at 6. Defendants

8

argue that the term lacks antecedent basis, and as a consequence, a POSITA would not know which claimed "active session" the term refers. *Id*. at 7 (citing Dkt. No. 19-1 at ¶ 28). Defendants further argue that "the term 'active session' is vague on its face." *Id*. at 7. Defendants contend that the '508 Patent discloses several different types of sessions and that the term does not make sufficiently clear, which of these "sessions" is the claimed "active session." *Id*. at 7-8. Plaintiff argues that the term "said active session" is not indefinite and that its meaning is readily discernable from the '508 Patent specification and its contextual use in the claims. Dkt. No. 20 at 11-13. The Court agrees with Plaintiff insofar as the term is not indefinite. The Court does not agree, however, with Plaintiff's proposed construction. For the reasons below, the Court finds that the term "said active session" means "an ongoing customer interaction with an e-banking touch point."

The "determination of claim indefiniteness is a legal conclusion that is drawn from the Court's performance of its duty as the construer of patent claims." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Section 112 entails a "delicate balance" between precision and uncertainty:

> On the one hand, the definiteness requirement must take into account the inherent limitations of language. Some modicum of uncertainty, the Court has recognized, is the price of ensuring the appropriate incentives for innovation. . . . At the same time, a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them. Otherwise there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims. And absent a meaningful definiteness check, we are told, patent applicants face powerful incentives to inject ambiguity into their claims . . . Eliminating that temptation is in order, and the patent drafter is in the best position to resolve the ambiguity in . . . patent claims.

*Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909-10 (2014) (citations omitted). Therefore, in order for a patent to be definite under § 112, ¶ 2, "a patent's claims, viewed in light of the specification and prosecution history, [are required to] inform those skilled in the art about

the scope of the invention with reasonable certainty." *Id*. at 910.  "The definiteness requirement . . . mandates clarity, while recognizing that absolute precision is unattainable." *Id*.  The '508 Patent is presumed valid.  35 U.S.C. § 282.  The burden is on Defendants to show by clear and convincing evidence that the term "said active session" fails to comply with the § 112 definiteness requirement.  *Nautilus*, 572 U.S. at 912 n. 10.

In *Energizer Holdings*, the Federal Circuit explained that "[w]hen the meaning of the claim would reasonably be understood by persons or ordinary skill when read in light of the specification, the claim is not subject to invalidity based upon departure from the protocol of 'antecedent basis.'" *Energizer Holdings, Inc. v. Int'l Trade Commn'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).  Here, whether claim 13, despite lack of explicit antecedent basis for the term "said active session," has a reasonably ascertainable meaning must be decided in context.  *Id*. at 1370.

Defendants argue that because of the lack of antecedent basis "a POSITA would not know to which claimed 'active session' the 'said active session' refers."  Dkt. No. 19 at 7.  That is, Defendants argue that the '508 Patent discloses different types of "sessions" and describes the term in multiple contexts, thus rendering the use of the term in claim 13, without antecedent basis, indefinite.  Dkt. No. 22 at 5.  The Court disagrees.[3]

Turning first to the claims, claim 13 identifies only one "active session," albeit without an antecedent basis.  '508 Patent at 10:61.  Even so, claim 13 clearly associates the term as pertaining to interaction with a financial institution customer.  For example, claim 13 identifies a number of "e-banking touch points," that are conventionally understood in the art to include some form of interaction by a financial institution customer, such as an automatic teller/transaction machine

---

[3] The Court notes that Defendants use the term "the active session" in their proposed construction of the term "targeted marketing content," thus suggesting that the term has a reasonably ascertainable meaning within the context of claim 13.

(ATM), self-service coin counter (SSCC), online accessible banking website, etc. *Id*. at 10:44-50. This is confirmed by the '508 Patent specification. *Id*. at 1:25-35 (describing that financial institutions no longer require customers to interact with a teller and identifying "typical" self-serving electronic delivery systems that are available). Claim 13 further describes that "said active session is monitored" for the purpose of selecting "targeted marketing content correlated to said user-defined preferences." *Id*. at 10:61-63. Claim 13 specifies that the targeted marketing content is "transmitted in real-time to at least one of said e-banking touch points for acceptance, rejection, or no response *by a user*." *Id*. at 10:66–11:1 (emphasis added). Claim 13 also describes that user response to the targeted marketing content determines "whether transmission of additional information related to said marketing content occurs during said active session." *Id*. at 11:1-4.

This understanding is consistent with the term's usage in independent claims 1 and 7. Claim 1 requires "monitoring via said server an active session in real-time for selection of targeted marketing content correlated to said user-defined preferences." '508 Patent at 9:12-14. Claim 1 further requires "transmitting in real-time said targeted marketing content during said active session to at least one of said e-banking touch points for acceptance, rejection, or no response by a user." *Id*. at 9:18-21. Claim 7 recites similar usage, but like claim 13, without an antecedent basis. *Id*. at 10:6-8 ("monitoring via said server said active session . . ."), 10:12-15 ("transmitting in real-time said targeted marketing content during said active session . . . for acceptance, rejection, or no response by a user").

In addition, dependent claims provide additional guidance regarding the contextual use of the term "said active session" in claim 13 as pertaining to customer interaction with an e-banking touch point. For example, claim 14 links the storage of transactional usage data to a customer profile. '508 Patent at 11:5-7. Claim 16 specifies that the transactional usage data can be used to

analyze specific customer habits.  *Id*. at 11:13-14.  Claim 19 describes the system as permitting distribution of advertisements, messages, offers, and promotions.  *Id*. at 11:21-23.  Accordingly, the Court finds that the contextual use of the term "said active session" in claim 13, along with additional guidance provided by the dependent claims, sufficiently ties the term to ongoing customer interaction with an e-banking touch point.

The specification confirms that claim 13's use of the term "said active session" refers to customer interaction with an e-banking touch point.  The '508 Patent explains that existing e-banking systems are deficient in that they limit the ability of financial institutions to provide a more personalized e-banking experience to customers.  '508 Patent at 1:57-60.  Figures 2A-2B are described as "illustrative depictions of the general steps that may be employed by system 100 in creating a personalized customer experience at an accessible e-banking touch points 106."  *Id.* at 4:46-51.

With reference to Figure 2A, the '508 Patent describes that "[a] customer interaction session is initiated, at step 202, when the customer successfully logs into an accessible e-banking touch point 106."  '508 Patent at 4:55-58.  The Court recognizes that Plaintiff relies on this portion of the '508 Patent specification in support of its proposed construction, which requires for "active" that "a customer is logged into an e-banking touchpoint."  Dkt. No. 20 at 11.  The Court finds, however, that Plaintiff's proposed construction—requiring customer login—to be overly restrictive because it potentially excludes a disclosed embodiment.  *SynQor, Inc. v. Artesyn Tech, Inc.*, 709 F.3d 1365, 1378-79 (Fed. Cir. 2013) ("A claim construction that 'excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support.'") (quoting *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010)).

Claim 13, describes e-banking touch points as including "a digital signage display." '508

Patent at 10:47. Similarly, the '508 Patent specification discloses that e-banking touch points may

include "a plasma signage display (PSD) touch point 106," which is illustrated in Figure 1. *Id*. at

3:36. The '508 Patent further discloses that marketing personnel can distribute ads, promotions,

and messages to the transaction screens of any select number of remote touch points. *Id*. at 3:48-

52. This manner of customer interaction via e-banking touch points is not described to require

customer login as suggested by Plaintiff's proposal. While the Court agrees with Plaintiff that the

'508 Patent does disclose an "active session" that utilizes customer login (*See, e.g.*, '508 Patent at

4:52-58), the Court finds that the term's use in claim 13 does not impose this additional

requirement.

### 2. Court's Construction

For the reasons set forth above, the Court finds that Defendants have not established by

clear and convincing evidence that the term "said active session," as used in claim 13 of the '508

Patent, is indefinite. Having found the term not indefinite, the Court construes the term to mean

"an ongoing customer interaction with an e-banking touch point."

### B. "said user-defined preferences"

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| plain and ordinary meaning | Indefinite |

### 1. Analysis

The term "said user-defined preferences" appears in claim 13 of the '508 Patent. The

parties dispute whether the claim term is indefinite, specifically whether the term informs a

POSITA about the scope of the invention with reasonable certainty. Dkt. No. 19 at 9. Like the

term "said active session," Defendants argue that the term "said user-defined preferences" lacks

antecedent basis, and as a consequence, a POSITA would not know to which claimed "user-

defined preferences" the term refers.  Dkt. No. 19 at 9 (citing Dkt. No. 19-1 at ¶ 39).  Defendants acknowledge that the '508 Patent specification provides multiple possibilities for what "user-defined preferences" could be, but Defendants argue that the specification does not provide a precise definition of the term or how it should be implemented in the claimed system.  *Id*. at 10.  Defendants contend that a POSITA would not be able to determine the term's scope with reasonable certainty, thus rendering it indefinite.  *Id*.  Plaintiff argues that the term "user-defined preferences" is not a technical term and would be readily understood by one of ordinary skill in the art.  Dkt. No. 20 at 13.  Plaintiff asserts that a POSITA, with reference to the claims and the specification, can discern the scope of the invention.  *Id*.  The Court agrees with Plaintiff.

As an initial observation, the Court notes that the phrase "said user-defined preferences" includes common words used in ordinary parlance.  Defendants argue that "[t]he issue is that a POSITA reading the patent would not be able to determine the meaning of the term with reasonable certainty."  Dkt. No. 22 at 6.  The Court disagrees.[4]

Although Defendants take issue with term's lack of antecedent basis in claim 13, the Court finds the lack of antecedent basis to be immaterial to whether the meaning of the term could be reasonably understood by a POSITA.  Claim 13 identifies a singular and specific instance of "said user-defined preferences."  '508 Patent at 10:61-63.  Claim 13 describes that the selection of targeted marketing content is correlated to "said user-defined preferences."  *Id*.  Claim 13 does not include different and alternative uses of the term that could create the potential for confusion and ambiguity.  Indeed, claim 1 includes similar usage of the term, but with proper antecedent basis.  *Id*. at 9:1-4 (describing previously stored data to include "one or more user-defined preferences"),

---

[4] The Court notes that Defendants use the term "user-defined preferences" in their proposed construction of the term "targeted marketing content," thus suggesting that the term has a reasonably understood meaning within the context of claim 13.

9:15-17 (describing the selection of targeted marketing content "correlated to said user-defined preferences").  Given the term's nearly identical usage in claim 1, the Court finds that the lack of antecedent basis in claim 13 does not pose a legitimate concern as to whether a POSITA could ascertain the meaning of the term with a reasonable degree of certainty.

In addition, the contextual use of the term "user-defined preferences" in the claims of the '508 Patent provides a strong indication that the term is not indefinite and should be attributed its plain and ordinary meaning.  Dependent claim 15, for example, confirms the term's straightforward use in the claims.  Claim 15 recites that "said user-defined preferences" includes "one or more of a customer name, a language to be used in connection with one or more of said touch points, an account for conducting transactions, and a monetary amount to be the subject of select transactions." '508 Patent at 11:8-12.  Dependent claims 3 and 9 provide similar recitations. *Id.* at 9:27-31 (claim 3), 10:21-25 (claim 9).

The '508 Patent specification confirms the plain and ordinary usage of the term "said user-defined preferences" in claim 13.  The specification discloses that for a returning customer the system stores and retrieves "preferences predefined by the customer via a personal touch point." '508 Patent at 4:66-67; *see also* 5:64-66 (describing the retrieval of a stored profile for a returning customer).  However, for a first time customer, the system generates a new customer profile prior to proceeding onto subsequent steps.  *Id*. at 5:2-7; *see also* 5:55-60 (describing the generation of a customer profile for a first time customer).  The specification further describes the ability for customers to modify their preferences to personalize their banking experience.  *Id*. at 5:45-50 (describing that "a personalized experience may be provided at any of the touch points 106 in accordance with customer selected options made"); *see also* 6:8-10.  Such modifiable customer preferences are described to include:  display of the customer's name, the customer's favorite

withdrawal account and amount, the customer's preferred language, or any other applicable customer preference.  *Id*. at 6:13-17.  Defendants acknowledge that the '508 Patent discloses specific examples for the term "said user-defined preferences" but argues that these examples are insufficient to inform a POSITA as to a precise definition for this term.  Dkt. No. 22 at 7.  The Court disagrees.

### 2.  Court's Construction

For the reasons above, the Court finds that Defendants have not established by clear and convincing evidence that the term "said user-defined preferences," as used in claim 13 of the '508 Patent, is indefinite.  Rather, the Court finds that a POSITA could reasonably ascertain the meaning of the term based on its contextual use in the claims, the specific examples provided by the '508 Patent, and the related disclosure provided in the specification.  Having found the term not indefinite, the Court concludes that the term should be given its plain and ordinary meaning.

### C.    "subsequent to said monitoring and transmitted in real-time"

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| plain and ordinary meaning | Indefinite<br><br>Alternatively,<br><br>transmitted after monitoring activities have concluded |

### 1.  Analysis

The phrase "subsequent to said monitoring and transmitted in real-time" appears in claim 13 of the '508 Patent.  Defendants argue that the phrase requires construction to resolve ambiguity as to whether or not the "monitoring" step is concluded before the claimed steps of "selecting" and "transmitting in real-time" occur.  Dkt. No. 19 at 10.  Because of this alleged ambiguity, Defendants assert that a POSITA would not know the meaning of this term with reasonable

certainty.  *Id.* (citing Dkt. No. 19-1 at ¶¶ 44, 46).  Plaintiff argues that the claim phrase does not require construction because the patentee used words that are not technical nor are they used in a confusing manner.  Dkt. No. 20 at 15.  Plaintiff contends that there is no reason to substitute a construction for the claim terms used by the patentee.  *Id.*  The Court agrees with Plaintiff that this phrase does not require construction.

Defendants proffer two alternative interpretations for the claim phrase:  1) the real-time monitoring of the active session has started and, while it is ongoing, the targeted marketing content is selected and transmitted to the e-banking touch point; or 2) the real-time monitoring of the active session has started and concluded, and after its conclusion, the targeted marketing content is selected and transmitted to the e-banking touch point.  Dkt. No. 19 at 11.  Defendants contend that both interpretations are plausible but that they cannot coexist, i.e., the claim must only cover one or the other scenario.  *Id.*  The Court disagrees that the scope of this phrase is limited to only one of Defendants' alternative proposals.

The dispute centers on whether the "monitoring" step in the claim phrase must conclude prior to sending the targeted marketing content to the touch point.  Nothing in claim 13 imposes the restriction sought by Defendants' proposed construction—that transmission occurs only after monitoring is concluded.  Rather, the plain language of the claim phrase imposes only an ordering requirement, that transmission occur "subsequent" to monitoring.  While Defendants' proposed construction correctly captures the ordering requirement with the use of the term "after," the remainder of Defendants' proposed construction is overly restrictive because it further requires that monitoring must be "concluded" prior to the transmission step.

Claim 13 does not restrict the manner of monitoring during or after the targeted marketing content is sent to the touch point.  *See* '508 Patent at 10:61–11:4.  This understanding is confirmed

by the '508 Patent specification, which describes the system as capable of "continuously monitor[ing]" the customer interaction session. *See, e.g.*, '508 Patent at 5:39-42 ("System 100 may be configured to continuously monitor for system predefined criteria, at step 214, and store the monitored information, at step 216, until a transaction session is determined, at step 218, to have ended."), 5:67–6:5 (describing that customer actions during the console session "may be monitored, at step 268 . . . and continuously stored and made accessible, at step 270, to all of the financial institution's other touch points"). Figures 2A and 2B further illustrate an iterative loop that includes monitoring, storage, and delivery of personalized content until the point at which the transaction has ended. *See* Figure 2A (boxes 210, 214, and 216), Figure 2B (boxes 262, 268, and 270). The Court therefore finds that both of Defendants' alternative interpretations are encompassed by the scope of the claim phrase.

### 2. Court's Construction

For the reasons set forth above, the Court finds that Defendants have not established by clear and convincing evidence that the phrase "subsequent to said monitoring and transmitted in real-time," as used in claim 13 of the '508 Patent, is indefinite. Having resolved the parties' apparent dispute concerning the scope of the phrase, the Court concludes that the phrase should be given its plain and ordinary meaning.

### D. "a common point of control of functionality provided by said system"

| Plaintiff's Proposal | Defendants' Proposal |
| --- | --- |
| plain and ordinary meaning | a centralized means of control to manage different e-banking touch points |

### 1. Analysis

The phrase "a common point of control of functionality provided by said system" appears in claim 17 of the '508 Patent. Defendants argue that construction is required because the claim

phrase is vague and does not provide sufficient meaning for the jury.  Dkt. No. 22 at 9.  More specifically, Defendants argue that "common" is a vague term that does not provide sufficient meaning by itself and that "control of functionality" does not provide sufficient meaning as to precisely what functionality is being controlled.  Dkt. No. 19 at 12.  Plaintiff argues that the claim phrase includes common and well-understood terms and therefore should be given its plain and ordinary meaning.  Dkt. No. 20 at 15.  The Court agrees with Plaintiff that this phrase does not require construction.

As an initial observation, the Court notes that the phrase "a common point of control of functionality provided by said system" includes ordinary words that should not be unfamiliar to a lay jury.  Defendants acknowledge that "each one of the words used in the term . . . by itself is 'common and well-understood'" but argues that the phrase as whole lacks sufficient clarity and meaning.  Dkt. No. 22 at 10.  The Court does not agree.  Rather than simply clarify meaning, Defendants' proposed construction appears to introduce additional limitations that would alter the scope of the original claim phrase.  For example, Defendants' proposed construction substitutes the phrase "a centralized means of control" for the claim phrase "a common point of control." Defendants' use of "centralized means" is suggestive of a particular device ("means") configured in the claimed system in a specific "centralized" arrangement.  Notably, the claim language— "common point of control"—does not impose these additional requirements.

The remainder of Defendants' proposed construction substitutes the phrase "to manage different e-banking touch points" for the claim phrase "of functionality provided by said system." Defendants argue that the phrase "control of functionality" does not provide sufficient meaning as to precisely what functionality is being controlled.  Dkt. No. 22 at 10.  Contrary to Defendants' argument, claim 17 specifies that the "common point of control" controls "functionality *provided*

*by said system.*"  '508 Patent at 11:16-17 (emphasis added).  Defendants' proposed construction would require that such functionality "provided by said system" must include "manage[ment] of different e-banking touch points."  While the functionality "provided by said system" may include "manag[ing] different e-banking touch points," claims 13 and 17 do not explicitly require this specific functionality.  *See* '508 Patent at cls. 13 and 17.  Moreover, Defendants' citations to the '508 Patent specification describe "manag[ing] different e-banking touch points" as an optional feature.  *See, e.g.,* '508 Patent at 8:8-11 ("A financial branch displayed on map 502 may be selected . . . to generate statistical reports . . . *or alternatively*, to manage touch points 106 at the selected branch.") (emphasis added), 8:17-23 (describing management of touch points as one of several possible features).

### 2.  Court's Construction

For the reasons above, the Court declines to enter Defendants' proposed construction and finds instead that the term should be attributed its plain and ordinary meaning.

### E.   "targeted marketing content"

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| plain and ordinary meaning | marketing content directed to an individual user based on user-defined preferences and monitored activity of the active session in which the marketing content is transmitted |

### 1.  Analysis

The term "targeted marketing content" appears in claim 13 of the '508 Patent.  The parties dispute whether the term requires construction.  Defendants argue that the term requires construction because it is not clear what type of content qualifies as the claimed "target marketing content."  Dkt. No. 19 at 15.  Plaintiff argues that Defendants have not sufficiently explained how the term is ambiguous, thus suggesting that a plain and ordinary construction is appropriate.  Dkt.

No. 20 at 16.  Plaintiff further argues that the meaning of the term is clear from its contextual use in the claim and needs no further construction.  *Id.* at 17.  The Court agrees with Plaintiff that this term does not require construction.

Defendants argue that their proposed construction is supported by the claim language itself. Dkt. No. 19 at 16.  While the Court agrees that claim 13 provides contextual guidance as to the meaning of term, the Court notes that Defendants' proposed construction deviates from the claim language in several respects.  First, claim 13 requires that the "targeted marketing content" is "*correlated* to said user-defined preferences."   '508 Patent at 10:61-62 (emphasis added). Defendants' proposed construction substitutes the phrase "based on" for claim 13's use of the term "correlated."   Second, Defendants' proposed construction requires that the "targeted marketing content" is further "based on . . . monitored activity of the active session."   Claim 13 does not impose this additional requirement.  *See* '508 Patent at 10:61–11:4.

Plaintiff takes issue with Defendants' proposed construction, arguing that it rewrites claim 13.  The Court agrees.  Defendants have not demonstrated a persuasive reason to deviate from the language of the claim.  The Court finds that the term "targeted marketing content" is self-defining from the descriptive nature of the term itself.  Moreover, the meaning and requirements of the term are readily apparent from its contextual use in the claim.

## 2.  Court's Construction

For the reasons set forth above, the Court declines to enter Defendants' proposal and concludes instead that the term should be given its plain and ordinary meaning.

## IV.   CONCLUSION

The Court adopts the constructions listed in the Claim Construction Order concurrent with this memorandum.  Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this memorandum is constrained by the Court's reasoning.  However, in the

presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this memorandum that is not an actual construction adopted by the Court.  The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED** this 3rd day of May, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE